1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                       CENTRAL DISTRICT OF CALIFORNIA

10   JOANNE KIZER,                    )     Case No. CV 05-04431-PJW
                                      )
11           Plaintiff,               )
                                      )     MEMORANDUM OPINION AND ORDER
12      v.                            )
                                      )
13   JO ANNE B. BARNHART,             )
     Commissioner of the             )
14   Social Security Administration, )
                                      )
15           Defendant.               )
     _____)

16

17                                    I.

18                              INTRODUCTION

19       Plaintiff brings this action seeking reversal of the decision by

20   defendant Social Security Administration ("the Agency") denying her

21   application for Disability Insurance Benefits ("DIB").  She asks the

22   Court to reverse the Agency's decision and award benefits to

23   Plaintiff, or, in the alternative, to remand the case to the Agency

24   for further proceedings.  For the reasons discussed below, the

25   decision of the agency is REVERSED, and the action is REMANDED for

26   further proceedings consistent with this opinion.

27

28

II.

FACTS

A.   Plaintiff's Personal History and Work History

Plaintiff was born on October 9, 1951, and was 52 years old when she testified at the administrative hearing held in this case. (Administrative Record ("AR") 76.)  After graduating from high school, she completed one year of college.  (AR 94.)  Plaintiff began working as a grocery store checker for Vons in 1973 and held that job for 29 years, until she quit in April 2002.  (AR 88-89.)  Plaintiff contends that she became unable to work due to neck pain on April 25, 2002, and has not worked since that date.  (AR 73.)  Plaintiff testified that, if she had been able to, she would have continued working for Vons until she was 55, when she would have been entitled to a larger pension as well as medical benefits.  (AR 308.)

B.   Plaintiff's Medical Condition and Treatment

In 1994, Plaintiff underwent surgery to fuse the C5 and C6 vertebrae and insert a compression plate in her neck.  (AR 199, 293-94.)  While the procedure provided some relief, Plaintiff experienced increasing neck, head, and shoulder pain in the years following the surgery.  (AR 305.)  In 1996, she was diagnosed with fibromyalgia by a neurologist.  (AR 292.)

During the year prior to the alleged onset date, Plaintiff regularly visited her physician, Dr. Couture, and a neurologist, Dr. Saito, complaining of progressively worsening pain in her neck, head, and arms.  (AR 122-24, 202-16.)  Dr. Couture noted that Plaintiff had tenderness over the posterior cervical area and paraspinal regions and into her shoulders, and that she had limited range of motion for lateral head movement, flexion, and extension secondary to pain.  (AR

2

202-03.)  Plaintiff was prescribed several medications, including Celebrex (an anti-inflammatory), Ultram (a pain reliever), Neurontin (an anti-seizure medication sometimes prescribed for pain, including pain associated with fibromyalgia), Naprelan (an anti-inflammatory), Elavil (an antidepressant), trazodone (an antidepressant), Effexor (an antidepressant).  (AR 123-24, 203, 205.)  Plaintiff also used Lidocaine patches to alleviate pain in her shoulder.  (AR 122-24.) Plaintiff experienced a sharp radiating pain in her head and scalp caused by wind or touch, that was not controlled with Tegretol or Depakote (epilepsy medications also used for headaches or neuralgia). (AR 205, 298.)

In 2001, Plaintiff's neurologist diagnosed her with occipital and vertex neuralgia[1] and hyperesthesia, and recommended that she undergo "nerve block" procedures.[2]  (AR 122-24.)  Plaintiff received two nerve blocks, which were "somewhat helpful," but decided not to have any more because they were too painful.  (AR 122.)  Thereafter, her doctor increased her dosage of Neurontin.  (AR 122.)

Plaintiff had been off work due to her chronic pain at times before the alleged onset date, however, as of April 25, 2002,

---

[1]  "Neuralgia" refers to pain that follows the path of a specific nerve.  Occipital neuralgia is a chronic pain disorder caused by irritation or injury to the occipital nerve located in the back of the scalp.  *See* National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/occipitalneuralgia/ occipitalneuralgia.htm.

[2]  A "nerve block" is an injection of nerve-numbing medication used to block a group of nerves, called a plexus or ganglion, that causes pain to a specific organ or body region.  Nerve blocks are sometimes used to avoid surgical options.  *See* The Cleveland Clinic Health Information Center, http://www.clevelandclinic.org/health/ health-info/docs/3600/3690.asp?index=12090.

Plaintiff stopped working because she "couldn't handle the pain anymore."  (AR 292.)  Plaintiff continued to see Dr. Couture frequently, complaining of progressively worsening pain, as well as depression and anxiety for which Plaintiff requested a referral for therapy.  (AR 134-144.)  Dr. Couture again noted tenderness and noted that Plaintiff was occasionally using Robaxin for pain relief.  (AR 134.)  A radiological examination revealed that, while Plaintiff's fused vertebrae appeared satisfactory, there was mild spondylosis[3] at C4-5.  (AR 148.)  Upon examination by an orthopedist, Dr. Choi, in May 2002, it was noted that Plaintiff had "moderate limitation of the motions of the neck especially extension of the neck," limitations on shoulder motion, more severe on the left side, and weak handgrip.  (AR 142.)  Another orthopedist, Dr. Dhillon, noted that Plaintiff stated that she was unable to do housework.  (AR 139.)  Dr. Dhillon's notes indicate that Plaintiff had received two epidural injections in her cervical spine, and was scheduled for a third.  (AR 132-33.)  At an August 2002 examination by Dr. Couture, Plaintiff reported that the epidural injections helped only "minimally," and Dr. Couture noted that Plaintiff had begun taking Vicodin to alleviate her pain.  (AR 136.)

Another radiological examination on September 3, 2002 again showed that Plaintiff's fusion was solid, but also revealed mild foraminal narrowing at C5-6 and disc space narrowing at C4-5 and C6-7.

---

[3]  Cervical spondylosis is "a disorder caused by abnormal wear on the cartilage and bones of the neck (cervical vertebrae) with degeneration and mineral deposits in the cushions between the vertebrae (cervical disks)."  National Institutes of Health Medline Plus Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/000436.htm.

1   (AR 146-47.)  On the same date, orthopedist Dr. Dhalla noted pain and

2   weakness in rotator cuff strength testing caused by tendinitis and

3   assessed Plaintiff as having "mechanical neck pain with no apparent

4   evidence on x-ray of degenerative disc disease or facet arthritis."

5   (AR 149-50.)  Nerve conduction studies administered on October 10,

6   2002 indicated mild radiculopathy[4] at the site of Plaintiff's neck

7   surgery.  (AR 238.)

8        Plaintiff was not examined by any state agency or consulting

9   physicians.  State agency physician Thu N. Do, M.D., reviewed

10  Plaintiff's file in October 2002 and agreed that Plaintiff was

11  "credible as supported by objective evidence," and that she could

12  perform medium work.  (AR 155.)  Dr. Do completed a Physical Residual

13  Functional Capacity Assessment form, wherein he opined, without

14  comment, that Plaintiff could occasionally lift 50 pounds and

15  frequently lift 25 pounds and that she could stand and/or walk or sit

16  for six hours in an eight-hour day.  (AR 158.)  Dr. Do further

17  concluded that Plaintiff should be limited in push/pull activities

18  with the upper extremities and should not engage in constant or

19  repetitive overhead reaching with her left arm.  (AR 158.)  He limited

20  Plaintiff to occasional climbing of ramps and stairs, balancing,

21  stooping, kneeling, crouching, and crawling, but no climbing of

22  ladders, ropes, or scaffolds.  (AR 159.)  Dr. Do found that Plaintiff

23  had no manipulative limitations other than limited reaching with the

24

25      [4]  "Radiculopathy" is a condition where injury near the root of a
    nerve results in pain at the end of the nerve such as an injury to the
26  vertebrae or disks in the neck that results in pain, numbness or
    weakness in the shoulder, arm, wrist or hand.  American Academy of
27  Orthopaedic Surgeons, http://orthoinfo.aaos.org/fact/thr_report.cfm?
    Thread_ID=179&topcategory=Neck.
28

1  left arm, and no environmental limitations other than to avoid

2  concentrated exposure to strong vibrations.  (AR 160-61.)  Dr. Do

3  concluded that Plaintiff's symptoms were attributable to a medically

4  determinable impairment.  (AR 162.)  On November 15, 2002, another

5  state agency physician, Norman Cooley, M.D., affirmed Dr. Do's

6  conclusion of a medium residual functional capacity with no constant

7  overhead reaching.  (AR 165.)

8       Plaintiff continued with her treatment with Dr. Couture.  At a

9  November 12, 2002 examination, she stated that she was still having a

10 lot of neck pain and that she did not believe she would be able to

11 return to work at all.  (AR 243.)  Plaintiff complained of head and

12 neck pain when walking, standing, sitting, or lying down, and reported

13 that the pain interrupted her sleep and made it difficult to groom

14 herself.  (AR 243.)  Dr. Couture noted that Plaintiff had full range

15 of motion with "mild-to-moderate" discomfort.  (AR 243.)  Plaintiff's

16 complaints of a great deal of neck pain continued into 2003.  (AR 244-

17 49.)

18      On September 1, 2003, Plaintiff was taken by paramedics to a

19 hospital due to vertigo and nausea that prevented her from walking.

20 (AR 261-63.)  She was given Valium and Antivert to control the

21 vertigo, and was admitted to the hospital.  (AR 261-63.)  Dr.

22 Maheshwari, who treated Plaintiff at the hospital, observed that

23 Plaintiff had "pain in the neck, limitation of neck movement, and the

24 pain goes down to the arm, particularly to the left."  (AR 267.)

25 Plaintiff refused additional testing at the hospital and requested to

26 be discharged on her third day of hospitalization due to the fact that

27 she did not have medical insurance.  (AR 261-268.)  On follow-up

28

examination with Dr. Couture, Plaintiff noted that she still experienced dizziness and nausea, and that the symptoms worsened with lateral head movements and upward gaze.  (AR 251.)

C.    Administrative Background

      1.    Prior Proceedings

      Plaintiff filed an application for DIB on September 11, 2002. (AR 73-75.)   That application was denied on October 24, 2002, and again on reconsideration on November 15, 2002.  (AR 47-50, 52-55.) Thereafter, Plaintiff requested a hearing before an administrative law judge ("ALJ"), which was granted.  (AR 63-66.)

      2.    Hearing Before the ALJ

      On November 17, 2003, the ALJ held a hearing at which Plaintiff, medical expert Dr. Joseph E. Jensen, and vocational expert Joseph Mooney testified.  (AR 288.)   Plaintiff testified that in 1994 she had undergone neck surgery and that in 1996 a neurologist told her that she had fibromyalgia.  (AR 292-93.)   She testified that she had neck and arm pain prior to leaving her job, that her symptoms disrupted her work, and that she finally quit when she could no longer tolerate the pain and her job became too difficult.  (AR 292-93.)   She testified that her orthopedist, Dr. Dhillon, had been treating her for her pain, but that he had "pretty much exhausted" treatment options other than additional nerve blocks, which Plaintiff had rejected.  (AR 295-96.)

      With respect to the pain she experienced, Plaintiff testified that driving was uncomfortable, and she was only able to go for short drives to run errands and do shopping.  (AR 297.)   She complained that she had not traveled or taken vacations because travel was very uncomfortable.  (AR 297.)   Her neighbors walked her dog for her, as she was unable to walk further than half a block because of pain

associated with exposure to the sun.  (AR 298.)  Plaintiff testified that she could neither sit nor stand for any length of time.  (AR 299.)  She testified that she was taking Ultram and Vicodin for pain and Celebrex for swelling.  (AR 299.)

Plaintiff testified that she was able to do only very light housework, such as dusting, and that other housework was difficult because bending and reaching were very uncomfortable.  (AR 299-300.) She explained that a neighbor helped her with other housework.  (AR 300.)  She stated that she had participated in some physical therapy, but that she had quit because it was too painful.  (AR 300.)  She testified that the most weight she could lift or carry was a gallon of water.  (AR 302.)  She noted that she could read for only short periods before her neck and arms would get sore, and she needed to use a headset to comfortably talk on the phone.  (AR 302-03.)  She testified that, even aside from the reaching and lifting involved, it would be very uncomfortable for her to work in her previous job because using the cash register keys would be uncomfortable.  (AR 303.)

On examination by her attorney, Plaintiff testified that, even with medication, the pain that caused her to stop working had been building over a couple of months before she stopped working, and, at the time she stopped, her pain was a nine on a zero-to-ten scale.  (AR 304-05.)  She testified that she had been using pain medication every day for approximately two years before the alleged onset date.  (AR 305.)

Plaintiff testified that at the time of the hearing she was using Ultram and Vicodin, including at least two Vicodin daily, to manage her pain.  (AR 305-06.)  She explained that she had discussed the

8

possibility of additional surgery to alleviate her pain, but testified
that her doctor advised her that surgery would be a last resort
because it could make some symptoms worse.  (AR 306.)

Medical expert Joseph E. Jensen, M.D. testified based on his
review of the medical evidence then in the record.  Dr. Jensen
testified that Plaintiff suffered from "chronic neck pain due to
cervical degenerative disc disease."  (AR 309.)  He opined that she
had radiculopathy in the upper left arm relating to nerve roots in her
cervical spine.  (AR 310.)  Dr. Jensen noted that the medical evidence
showed disc bulging and narrowing in her cervical vertebrae.  (AR
310.)  While he testified that there was "no good evidence" of nerve
root compression, he found that there was evidence of nerve root
changes.  (AR 310.)  Dr. Jensen also testified that the evidence
showed that Plaintiff had a history of occipital neuralgia manifested
in headaches, and rotator cuff tendinitis.  (AR 310.)  Dr. Jensen
opined that Plaintiff's impairments, neither individually nor in
combination, met a Listing.  (AR 310-11.)

Without discussing Plaintiff's pain symptoms, Dr. Jensen opined
that Plaintiff could lift 20 pounds occasionally and 10 pounds
frequently.  (AR 311.)  He stated that Plaintiff could stand or walk
six hours in an eight-hour day, and sit six hours in an eight-hour day
with normal breaks.  (AR 311.)  He concluded that Plaintiff's push-
pull activities should be limited to the same weights as lifting, but
no more than 10 pounds with the left arm.  (AR 311.)  He testified
that Plaintiff should not reach over shoulder level, and only
occasionally lower than shoulder level with the left arm.  (AR 311.)
The only limitation relating to manipulation he recommended was no
forceful torquing with either arm.  (AR 312.)  He limited her postural

activities to an occasional basis, but recommended no crawling or climbing of ropes, ladders, or scaffolding.  (AR 312.)  He did not recommend limits on neck movement except only occasional gazing above eye level.  (AR 312.)

On examination by Plaintiff's attorney, Dr. Jensen testified that there was "physical evidence of weakness" in Plaintiff's medical records, and that the pain that Plaintiff was experiencing could be caused by a medically determinable impairment, specifically cervical disc disease.  (AR 312.)  Dr. Jensen also testified that spondylosis identified in the medical records could also be a source of Plaintiff's pain.  (AR 313.)  Dr. Jensen believed that there was no evidence that Plaintiff was malingering or "artificially embellishing" her complaints.  (AR 314.)

The ALJ questioned the vocational expert, Mr. Mooney, regarding hypothetical limitations on Plaintiff's work activities.  Mr. Mooney testified that, if the ALJ found that Plaintiff was precluded from sustained standing and walking, she could not engage in her past work or any other work.  (AR 315.)  The ALJ then presented the vocational expert with a hypothetical question, matching Dr. Jensen's assessment of Plaintiff's residual functional capacity.  (AR 315.)  Based on those hypothetical limitations, the vocational expert concluded that Plaintiff could not do her past work as a grocery checker.  (AR 315-16.)  Mr. Mooney testified that Plaintiff could, however, transfer her skills, including office equipment and interpersonal skills, to other cashier positions that were semi-skilled and light.  (AR 316-17.)  He further testified that she could work as a customer service clerk at a light or sedentary level, or that she could work as a general clerk.

1   (AR 316.)  He testified that each of these alternate jobs was present
2   in significant numbers in the local and national economies.  (AR 316.)
3       Plaintiff's attorney asked the expert whether Plaintiff would
4   still find work if she had to take extra unscheduled breaks amounting
5   to an hour per day.  (AR 317.)  The expert testified that, under those
6   circumstances, Plaintiff would not be able to continue competitive
7   employment unless she could find a special accommodation.  (AR 317.)
8       3.   The ALJ's Decision
9       The ALJ issued a decision denying Plaintiff's application for DIB
10  on February 18, 2004.  (AR 31-40.)  He analyzed Plaintiff's claims
11  under the Agency's five-step sequential evaluation process.  At step
12  one, he found that Plaintiff had not engaged in substantial gainful
13  activity since her alleged onset date.  (AR 32.)  At steps two and
14  three, he found that Plaintiff's cervical disc disease with
15  radiculopathy were "severe" impairments, but that they did not singly
16  or in combination meet a Listing.  (AR 32.)  At step four, he found
17  that Plaintiff could not return to her prior work as a grocery store
18  checker.  (AR 37.)  At step five, he concluded that she had
19  transferrable skills and retained the residual functional capacity to
20  perform work existing in significant numbers in the economy, including
21  work as a cashier, customer service clerk, or general clerk.  (AR 38-
22  39.)  The ALJ concluded, therefore, that Plaintiff was not under a
23  disability for purposes of the Social Security Act.  (AR 40.)
24      4.   Appeals Council Review
25      Plaintiff sought review of the ALJ's decision by the Appeals
26  Council and submitted additional evidence, including a Physical
27  Residual Functional Capacity Questionnaire completed by her treating
28  physician, Dr. Couture.  (AR 7, 283.)  In that assessment, dated May

3, 2005, Dr. Couture stated that Plaintiff was diagnosed with fibromyalgia, chronic neck pain, depression/anxiety, and chronic fatigue.  (AR 283.)  He stated that Plaintiff had chronic daily pain, described as level 7 to 9 on a scale of 10, which was increased by cold, heat, movement, air flow, and stress.  (AR 283.)  Dr. Couture stated that Plaintiff was being treated with medications including Ultram, Xanax, Trazodone, Vicodin, Robaxin, and Effexor, many of which cause drowsiness.  (AR 284.)  Dr. Couture opined that Plaintiff's impairments were reasonably consistent with her symptoms and with the limitations he described in the questionnaire, that she was not a malingerer, and that her depression and anxiety contributed to her symptoms.  (AR 284.)  With respect to Plaintiff's ability to perform work-related activities, Dr. Couture stated that Plaintiff could walk a quarter block without rest, sit for ten minutes and stand for fifteen minutes at a time, sit for less than two hours in an eight-hour day, and stand or walk for less than two hours in an eight-hour day.  (AR 285.)  He stated that Plaintiff would need breaks to walk approximately every twenty minutes for ten minutes each time, and would need unscheduled breaks.  (AR 285.)  Dr. Couture opined that Plaintiff was not able to work an eight-hour day.  (AR 286.)  Nevertheless, Dr. Couture recommended the following limitations on work activities: frequent lifting of ten pounds, but no more; significant limitations on repetitive reaching, handling, or fingering, spending no more than ten percent of an eight-hour day performing any such activities; avoidance of temperature extremes; and avoidance of noise, dust, fumes, moving air, sunlight, and humidity.

12

(AR 286-87.)  Dr. Couture also stated that Plaintiff had mostly "bad days," and that he would anticipate her being absent from work more than three times a month.  (AR 287.)

In deciding whether to review the ALJ's decision, the Appeals Council also considered medical records from Plaintiff's hospital stay for vertigo, as discussed above, and other medical records from 2004.  (AR 7.)  The additional medical evidence included a radiology report by Dr. Norman E. Snyder, noting lucent zones at Plaintiff's C6 vertebra, notes by Dr. Dhillon, recommending a CT scan of Plaintiff's neck and noting that additional neck surgery may be necessary, and additional records from Dr. Couture, indicating similar findings and treatment as in the records that were before the ALJ.  (AR 7, 272-81.)

On May 24, 2005, the Appeals Council denied Plaintiff's request for review.  (AR 4-6.)  It rejected Dr. Couture's opinion of Plaintiff's residual functional capacity, because, "as found by the Administrative Law Judge, Dr. Couture's opinions are unsupported by clinical findings, including his own."  (AR 4.)  The Appeals Council concluded that the ALJ had properly discredited Plaintiff's complaints and that his conclusion was supported by evidence in the record.  (AR 6.)  Plaintiff then filed suit in this Court.

III.

ANALYSIS

Plaintiff alleges that the Agency erred by: (1) failing to provide clear and convincing reasons for rejecting Plaintiff's subjective pain complaints; (2) improperly rejecting the opinions of non-examining physicians over the opinion of Plaintiff's treating physician; and (3) identifying jobs Plaintiff could still perform that were inconsistent with her residual functional capacity.  (Joint

13

Stipulation ("JS") 4, 22, 35.)  For the reasons set forth below, the Court finds that the ALJ failed to set forth clear and convincing reasons for finding Plaintiff's subjective pain complaints not credible and improperly discredited the opinion of Plaintiff's treating physician, and, therefore, remand is required.

A.   Standard of Review

     "Disability" under Agency regulations is defined as the inability to perform any substantial gainful activity due to any "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *See* 42 U.S.C. § 423(d)(1)(A).  The Court may overturn the ALJ's decision that a claimant is not disabled only if the decision is not supported by substantial evidence or if the decision is based on legal error. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)(quoting *Green v. Heckler*, 803 F.2d 528, 529 (9th Cir. 1986)).  "Substantial evidence" is such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Magallanes*, 881 F.2d at 750. It is "more than a mere scintilla but less than a preponderance." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998).  This Court must uphold the ALJ's conclusion even if the evidence in the record "is susceptible to more than one rational interpretation."  *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

     1.   The ALJ Failed to Properly Consider Plaintiff's
          Subjective Complaints

     Plaintiff argues that the ALJ failed to properly consider her subjective complaints and to assess her credibility as required by Social Security Ruling ("SSR") 96-7p and Ninth Circuit precedent.  The

14

1  Court agrees with Plaintiff and finds that the ALJ failed to set forth
2  a proper basis for finding that Plaintiff's subjective complaints were
3  not credible.  For this reason, remand on this issue is warranted.

4      Pain or other symptoms of sufficient severity caused by
5  "medically diagnosed 'anatomical, physiological, or psychological
6  abnormality' may provide the basis for determining that a claimant is
7  disabled." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir.
8  1997)(quoting 42 U.S.C. § 423(d)(5)(A), and citing *Bunnell v.*
9  *Sullivan*, 947 F.2d 341, 344-45 (9th Cir. 1991)(*en banc*)).  The Ninth
10 Circuit recognizes that the weight to give pain or other subjective
11 symptom testimony is a difficult determination to make because "pain
12 is a highly idiosyncratic phenomenon, varying according to the pain
13 threshold and stamina of the individual victim."  *Howard v. Heckler*,
14 782 F.2d 1484, 1488 (9th Cir. 1986).

15     To assist in analyzing the credibility of alleged symptoms, the
16 Ninth Circuit has adopted a two-step analysis.  First, the ALJ must
17 examine the evidence to determine whether the claimant has met her
18 burden of producing objective medical evidence of an impairment, and
19 of showing that the impairment reasonably could be expected to produce
20 a symptom.  *See Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir.
21 1996).  Once a claimant produces objective evidence of an underlying
22 impairment that is "reasonably likely" to cause some kind of symptom,
23 the ALJ may not reject the claimant's subjective complaints regarding
24 the extent and severity of her symptoms merely because the severity of
25 those symptoms cannot be supported by objective medical evidence.  *See*
26 *Bunnell*, 947 F.2d at 343.

27     The crux of Plaintiff's argument is that the reasons cited by the
28 ALJ for rejecting her subjective pain complaints amounted to no more

than a conclusion that her symptoms were not supported by the
objective medical evidence, thereby failing to meet the standard set
forth in *Bunnell*.  (JS 12.)  The Court agrees.

Although a claimant must produce medical evidence of an
underlying impairment reasonably likely to be the cause some pain, she
is not required to submit medical findings that support the severity
of her pain.  *See Drouin v. Sullivan*, 966 F.2d 1255, 1258 (9th Cir.
1992).  The severity of pain is usually established by other means,
including claimant's testimony.  A claimant's testimony concerning the
severity of her pain can only be rejected for specific, clear, and
convincing reasons.  *See Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.
1996) ("For the ALJ to reject the claimant's complaints, [the ALJ]
must provide specific, cogent reasons for the disbelief.")(internal
quotation marks and citation omitted).

In evaluating a claimant's subjective testimony, the ALJ must
consider "all of the evidence presented," including: (1) the
claimant's daily activities; (2) the location, duration, frequency,
and intensity of pain and other symptoms; (3) precipitating and
aggravating factors, such as movement, activity, and environmental
conditions; (4) the type, dosage, effectiveness and adverse side
effects of any pain medication; (5) treatment, other than medication,
for relief of pain or other symptoms; (6) any other measures used by
the claimant to relieve pain or other symptoms; and (7) other factors
concerning the claimant's functional restrictions due to such
symptoms.  *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also*
SSR 96-7p.  The ALJ also may employ "ordinary techniques of
credibility evaluation," considering: (8) the claimant's reputation
for truthfulness; (9) inconsistencies within the claimant's testimony,

or between the claimant's testimony and the claimant's conduct; (10) a lack of candor by the claimant regarding matters other than the claimant's symptoms; (11) the claimant's work record; and (12) information from physicians, relatives, friends, or others concerning the nature, severity, and effect of the claimant's symptoms. *See Light*, 119 F.3d at 792; *Fair v. Bowen*, 885 F.2d 597, 604 n.5 (9th Cir. 1989).

In rejecting Plaintiff's subjective complaints of pain, the ALJ enumerated a list of reasons supporting his decision. (AR 36-37.) The Court finds that these reasons are either not supported by substantial evidence or are not legitimate reasons for rejecting her credibility. For this reason, the ALJ's credibility finding was in error.

The first reason offered by the ALJ was that he found that "no objective findings support[ed] [Plaintiff's] allegations of limitations to the extent alleged." (AR 36.) The Court disagrees with this finding. September 2002 X-rays showed minimal disc space narrowing and mild foraminal narrowing. (AR 146.) X-rays from April 2002, showed mild spondylosis at C4-5. (AR 148.) Electromyography tests in October 2002 showed mild radiculopathy at C5-6. (AR 127-28.) These are objective findings which, though minimal, could, arguably, support Plaintiff's claimed limitations and pain. The medical expert called by the ALJ to provide medical testimony recognized this. He noted that there was "physical evidence of weakness" in the medical record. (AR 312.) He also agreed that Plaintiff's cervical disc disease, spondylosis, and neck surgery could cause Plaintiff pain.

17

(AR 313.)   Thus, even the medical expert agreed that there were objective findings in this record supporting Plaintiff's claims that were either overlooked or ignored by the ALJ.

The ALJ's second reason for rejecting Plaintiff's credibility was that she neither claimed nor established a medically determinable mental impairment.  (AR 37.)  This reason is irrelevant to the ALJ's credibility determination; Plaintiff has not alleged a connection between her claimed physical limitations and a mental impairment.  Thus, this reason is rejected.

The ALJ's third reason for finding that Plaintiff was not credible was that she did not "exhibit significant atrophy or difficulty moving."  (AR 37.)  Presumably, the ALJ determined that if Plaintiff really suffered from severe pain and was unable to move as a result of the pain she would have shown signs of atrophy and would have difficulty moving.  Though this appears to be a logical conclusion, the ALJ provided no basis to support this connection.  Moreover, the conclusion that Plaintiff had no difficulty moving is contradicted by the Plaintiff's own testimony, the observations of her physicians, and the residual functional capacity assessment performed by the medical expert whose opinion the ALJ accepted.  (AR 35, 142, 251, 261, 293, 300-302.)

The ALJ's fourth, fifth, and sixth reasons, relating to unremarkable examination findings, conservative treatment, and medication side-effects, are proper factors to consider in evaluating the Plaintiff's subjective complaints, but do not provide an adequate basis for rejecting her complaints in this case.  With respect to unremarkable examination findings--i.e., the ALJ's conclusion that tenderness to palpation was the only finding--the Court disagrees.

18

Plaintiff's treating physicians noted that she had pain and weakness with movement, and that she suffered from radiculopathy, occipital and vertex neuralgia, and hyperesthesia.  (AR 122-24, 149-50, 235, 243.) As to the ALJ's determination that Plaintiff's treatment and medications did not cause side-effects, the Court is at a loss to understand the significance of this finding.  Plaintiff does not claim that side-effects from medications cause or contribute to her disability.  Thus, this appears to be irrelevant.

The ALJ's conclusion that Plaintiff's treatment reflected a "conservative approach" is also puzzling.  To begin with, Plaintiff underwent surgery to resolve her pain, having two of her vertebrae fused.  Thereafter, Plaintiff was treated by her physicians with a wide variety of pain and other medications, including at least two Vicodin daily.  (AR 123-24, 203, 205, 299, 305-06.)  Plaintiff also underwent several painful procedures in an effort to find relief for pain, including nerve blocks and epidural injections, which Plaintiff stated did not provide much relief.  (AR 122-24, 132-33, 136.) Additionally, Plaintiff's physician was considering additional surgery, but recommended it only as a last resort.  (AR 306.)  This does not amount to conservative treatment.

The ALJ's seventh reason for discrediting Plaintiff's pain complaints was that the claim of disabling pain was contradicted by Plaintiff's daily activities.  (AR 37.)  The Court disagrees with this finding.  Though the extent of a claimant's daily activities is an appropriate consideration for the ALJ in determining credibility, the regulations do not require that a claimant be utterly incapacitated to obtain benefits.  *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  Further, to be relevant, the activities must be transferable

to the workplace.  *Id*.  At the hearing, Plaintiff testified that she had difficulty driving, no longer traveled, could not walk her dog, could only do very light housework, such as dusting, and could not lift any more than a gallon of water.  (AR 298-302.)  Plaintiff also testified that she was dependent upon neighbors for housework and walking her dog.  (AR 298, 300.)  Viewing this evidence as a whole, the ALJ's finding that Plaintiff was able to do some dusting, shopping, and cooking was not a clear or convincing reason for finding that Plaintiff's claims of pain and limitations were not credible.

Finally, the ALJ's eighth reason for rejecting Plaintiff's testimony regarding pain and limitations--*i.e.*, that he agreed with the residual functional capacity assessment provided by the medical expert, who never even examined Plaintiff--is not very convincing. Had any of the ALJ's other seven reasons for rejecting Plaintiff's credibility been valid, the Court might look at the ALJ's finding as to number eight in a different light.  But given the fact that these other reasons have been rejected, the Court cannot conclude that this reason alone is enough to carry the day.  For these reasons, the ALJ's credibility determination is reversed and remanded for further consideration.

2.   The ALJ Failed to Properly Evaluate The Medical Evidence

Plaintiff contends that the Agency improperly rejected the opinions and findings of her long-time treating physician, Dr. Couture, in favor of the opinions of non-examining state agency physicians and the medical expert.  Plaintiff also argues that the ALJ failed to develop the record with respect to the limitations attributable to her conditions.  For the following reasons, the Court agrees.

In general, a treating physician's opinion as to the nature and extent of an impairment will be given controlling weight if it is well-supported by objective medical evidence and is not inconsistent with the other substantial evidence in the record.  20 C.F.R. § 416.927(d)(2).  Where the treating physician's opinion is contradicted by the opinion of a non-treating physician, the ALJ may disregard the treating physician's opinion provided that the ALJ makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.  *Magallanes*, 881 F.2d at 751.

In rejecting the disability opinion of Plaintiff's treating physician, the ALJ summarily concluded that Dr. Couture's opinion was conclusory, not supported by functional limitations, and was based primarily on Plaintiff's subjective complaints of pain.  (AR 36.) These reasons are not supported by this record.

As to the opinion being conclusory, though Dr. Couture's actual opinion may have been brief, it was supported by more than 50 pages of medical records, spanning almost 18 months of regular treatment.  (AR 198-252.)  The notes contained within these pages are extensive and thorough.

The ALJ also rejected Dr. Couture's opinion because it was based on Plaintiff's subjective complaints, which the ALJ rejected.  (AR 36.)  Though, the opinion of a treating physician that is based upon the claimant's subjective complaints may be rejected where the claimant's credibility is called into question, *see Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999), in light of

the Court's conclusion that the ALJ's rejection of Plaintiff's
credibility was in error, the ALJ's decision to discredit Dr.
Couture's opinions on that basis cannot stand.

Finally, the ALJ rejected Plaintiff's treating physician's
opinion because it was contradicted by the non-treating physicians'
opinions.  This is not a legitimate reason for rejecting the treating
physician's opinion, absent something more.

For these reasons, the ALJ's rejection of the treating
physician's opinion is reversed and remanded for further
consideration.

3.   <u>On Remand, The ALJ Should Develop the Record as Necessary
     With Respect to Residual Functional Capacity and
     Availability of Occupations</u>

Plaintiff contends that the ALJ's identification of occupations
which Plaintiff retained the capacity to perform was flawed inasmuch
as he identified occupations that require frequent reaching, while he
found that Plaintiff could only occasionally reach at shoulder level,
and never overhead, with the left arm.  (JS 36, AR 36.)  The decision
of the ALJ that Plaintiff could perform such jobs was based upon his
determination of Plaintiff's residual functional capacity, and the
testimony of the vocational expert that, given such limitations,
Plaintiff could perform the functions of a general clerk, cashier, or
customer service clerk.  (AR 38, 40.)  While those occupations may
require some reaching, the Court agrees with the Agency that the ALJ
did not deviate from the Dictionary of Occupational Titles ("DOT") in
relying on the vocational expert's testimony.  There is no indication
in the DOT that any of the identified occupations would require
overhead reaching or more than occasional shoulder-height reaching

with the left upper extremity.   In light of the Court's conclusions
above with respect to the ALJ's findings as to the Plaintiff's
credibility and her treating physician's opinion, however, the ALJ may
need to revisit this issue as well.

IV.

CONCLUSION

For the reasons set forth above, the decision of the Agency
denying Plaintiff's claim for Disability Insurance Benefits is
reversed and the case is remanded to the Agency for further
proceedings consistent with this Opinion.


IT IS SO ORDERED.

DATED:      January  12   , 2007.



_____
PATRICK J. WALSH
UNITED STATES MAGISTRATE JUDGE

S:\PJW\Cases-Soc Sec\KIZER\Memo Opinion_Order.wpd

23